**METZ, et al., Plaintiffs,**

v.

**UNITED COUNTIES BANCORP, et al., Defendants.**

**Civil Action No. 96–5276(WHW).**

United States District Court,
D. New Jersey.

Aug. 24, 1999.

365

Daniel J. McCarthy, Thomas C. Jardim, ROGUT, McCarthy & Bhend, WestCranford, NJ, for plaintiffs.

Kathleen McLeod Caminiti, Terence J. Nolan, Christopher Walsh, Collier, Jacob & Mills, Somerset, NJ, for defendants.

## OPINION

WALLS, District Judge.

This matter is before the Court on the motion of the defendants to dismiss Counts III through XII of the amended complaint. The motion is granted in part and denied in part. Defendants and plaintiffs have filed cross motions for summary judgment on Count I of the amended complaint. The Court grants the defendants' cross motion and denies that of the plaintiffs.

### Factual Background

The eighty plaintiffs are all former employees of the now defunct defendant United Counties Bankcorporation ("United Counties"). Some were also shareholders. Through the process of two corporate mergers in quick succession, plaintiffs eventually came under the employ of defendant CoreStates Financial Corporation ("CoreStates"). Shortly after the second merger, plaintiffs' employment was terminated by CoreStates.

In essence, plaintiffs complain that during the pendency of the mergers, defendants made myriad false or misleading statements about the employee and severance benefits to which United Counties employees would be entitled post merger. Plaintiffs claim that they were induced by these statements to support the proposed mergers and to remain in the employ of the pre-merger entities. Their complaint charges that the defendants made these misstatements knowingly and willfully or in reckless disregard of their falsity, and plaintiffs assert that they relied on the statements to their detriment.

The relevant factual history is:

On May 24, 1995, United Counties and defendant Meridian Bancorp Inc. ("Meridian") announced that the two banks would merge through an exchange of stock, with Meridian surviving. The press release stated that the resultant bank would be headquartered at the Cranford, New Jersey headquarters of United Counties. The plaintiffs claim that they were told that individuals employed at that location would be secure in their jobs. Under the terms of the merger agreement, United Counties employees who became Meridian employees and were involuntarily terminated within one year of the merger would receive a severance benefit of one week of their pre-termination salary times the number of full years of service with United Counties.[1] The merger was approved by a vote by the United Counties shareholders on February 7, 1996. On February 23, 1996, United Counties became a division of Meridian and ceased to exist as a separate entity.

On October 10, 1995, during the pendency of the United Counties–Meridian merger, Meridian and CoreStates also agreed to merge through an exchange of stock. CoreStates was to survive that merger. During that month, CoreStates published and disseminated its "Partnership Guarantee Contract" ("Partnership Guarantee"), which, according to the plaintiffs, guaranteed to all employees, includ-

---

1. The benefit was subject to a minimum of four weeks of pay and a maximum of 30 weeks of pay.

ing plaintiffs, significant severance benefits in the event of their involuntarily termination as a result of the CoreStates–Meridian merger. These benefits were more generous than those guaranteed under the United Counties–Meridian merger agreement. Plaintiffs assert that this document was published to employees to obtain their support for the merger and to entice them to remain in the employ of the defendants. Notwithstanding that they were not at the time employed by either Meridian or CoreStates, plaintiffs claim that they relied on these representations to their detriment.[2]

Plaintiffs came to know about and rely upon the Partnership Guarantee through CoreStates' publication of three or four other documents. Plaintiffs declare that both the proxy statement/prospectus filed with federal and state regulatory authorities and furnished to CoreStates and Meridian shareholders in January 1996 and the CoreStates–Meridian Merger Agreement stated that all Meridian employees would be entitled to salary, bonus and benefits packages on substantially the same terms and conditions as those offered to CoreStates employees under the Partnership Guarantee. The severance policy set forth in the Partnership Guarantee was circulated to all employees of CoreStates and Meridian in an October 20, 1995 newsletter. After CoreStates formally adopted the severance policy in the Partnership Guarantee as part of its severance plan, it published a "Summary Plan Description" detailing the terms of the Partnership Guarantee. The complaint alleges that "[d]efendants represented orally, and through various publications, that plaintiffs were entitled to severance benefits according to a formula described in the Partnership Guarantee Contract." Compl. at ¶ 67. The Meridian–CoreStates merger was ef-

fected on April 16, 1996, and plaintiffs became employees of CoreStates.

Around May 1996, plaintiffs received a "Q & A" fax sheet from CoreStates together with notices that their employment was to be terminated. Through the fax sheet, they learned that CoreStates did not intend to provide them with the severance benefits detailed in the Partnership Guarantee. Plaintiffs claim that this denial of benefits is violative of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"), federal and state securities laws, and federal and state Racketeer Influenced and Corrupt Organizations Act ("RICO") statutes. Plaintiffs also assert that CoreStates denial constitutes breach of contract, fraudulent misrepresentation, and intentional infliction of emotional distress. Defendants have moved to dismiss Counts III through XII of the amended complaint. Defendants and the plaintiffs have filed cross motions for summary judgment on Count I of the amended complaint.

### Legal Standard for a 12(b)(6) Motion to Dismiss

On a Rule 12(b)(6) motion, the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir.1994). The question is whether the plaintiff can prove any set of facts consistent with her allegations that will entitle her to relief, not whether she will ultimately prevail. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

While a court will accept well-pleaded allegations as true for the purposes of the

**2.** The complaint asserts generally that the guarantees in the Partnership Guarantee applied also to plaintiffs. Compl. at ¶ 49. Because plaintiffs do not allege that the document makes any specific reference to them or any other parties not employed by CoreStates,

and because they offer nothing to support this allegation, the inference that the Court draws from their assertion is that plaintiffs inferred that the benefits would apply to them by the documents described *infra*.

motion, it will not accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Washington Legal Found. v. Massachusetts Bar Found.*, 993 F.2d 962, 971 (1st Cir.1993); *Violanti v. Emery Worldwide A–CF Co.*, 847 F.Supp. 1251, 1255 (M.D.Pa.1994). Moreover, the claimant must set forth sufficient information to outline the elements of her claims or to permit inferences to be drawn that these elements exist. *See* Fed. R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### *Analysis*

1. *Federal RICO Claims*

Plaintiffs assert that defendants' allegedly false and misleading statements, disseminated, as they were, through interstate mail and by means of wire and telephone communications constituted a pattern of racketeering activity and conspiracy to defraud plaintiffs and the public in violation of the federal RICO statute, 18 U.S.C. § 1962.

Section 107 of the Private Securities Litigation Reform Act of 1995, Pub.L. 104–67, 109 Stat. 737 (1995), ("PSLRA") amended 18 U.S.C. § 1964(c) so that this statute now provides: "no person may rely upon any conduct that may have been actionable as fraud in the purchase or sale of securities to establish a violation of [18 U.S.C.] § 1962." This amendment was prompted by "significant evidence of abuse in private securities lawsuits" and was intended to "[implement] needed procedural protections to discourage frivolous lawsuits." H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess., at 31. The effective date of the PSLRA was December 22, 1995. The PSLRA states that "[t]he amendments made by this title shall not affect or apply to any private action arising under Title I of the Securities Exchange Act of 1934 or Title I of the Securities Act

of 1933, commenced before and pending on the date of enactment of this Act." Pub.L. No. 104–67, 109 Stat. at 758 (1995).

▇▇▇▇ There has been some disagreement as to whether the PSLRA only applies prospectively to RICO based securities claims. Normally, a newly enacted statute cannot be given retroactive effect absent a clear expression of congressional intent. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280–81, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Several courts, however, have held that the PSLRA bars pre-enactment conduct unless the plaintiff's action was pending before the PSLRA's enactment. *See e.g., Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1337 (7th Cir.1997); *Krear v. Malek*, 961 F.Supp. 1065 (E.D.Mich.1997); *ABF Capital Management v. Askin Capital Management, L.P.*, 957 F.Supp. 1308 (S.D.N.Y. 1997). Based on this Court's understanding of the language and purposes of the PSLRA, it agrees with the above courts and finds that the PSLRA applies to the present case filed in November, 1996.

▇▇▇▇ The plaintiffs assert that the predicate acts upon which they rely are mail fraud and wire fraud. The defendants respond that while mail or wire fraud could be used as predicate acts for a RICO claim in some situations, they may not be used as such when they "are based on conduct which would have been actionable as securities fraud." *In re Prudential Securities Incorporated Limited Partnerships Litigation*, 930 F.Supp. 68, 77 (S.D.N.Y.1996) (*quoting* H.R. Cong. Rep. No. 369 at 47 (1995)); *see also Krear v. Malek*, 961 F.Supp. 1065, 1074 (E.D.Mich.1997) ("[i]t is abundantly clear that Congress intended that conduct constituting wire and mail fraud not form the basis of a predicate act under the amendment if such conduct would also be actionable as securities fraud"); *ABF Capital Management v. Askin Capital Management*, 957 F.Supp. 1308, 1319 (S.D.N.Y.1997) ("Congress intended to capture claims of wire and mail

fraud in connection with [the purchase or sale of securities]") (citations omitted).

The plaintiffs rely on language from *Eagle Traffic Control, Inc. v. James Julian, Inc.*, that "mail fraud is a predicate act and because [plaintiff's] complaint alleges, in part, mail fraud, we find that [plaintiff] has adequately pleaded racketeering activity under RICO" 933 F.Supp. 1251, 1257 (E.D.Pa.1996). *Eagle Traffic*, however, involved alleged mail fraud in the context of construction contracts. *Id.* at 1254–55. The *Eagle* case does not support the contention that mail or wire fraud, actionable as securities fraud, can constitute predicate acts under RICO.

Because the plaintiffs' federal RICO claim arises out of an alleged context of securities fraud, mail and wire fraud, the Court finds that it is barred by the PSLRA and dismisses it with prejudice.

2. *New Jersey State RICO Claims*

The New Jersey state RICO statute mirrors the prohibitions of the federal statute:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

N.J.S.A. 2C:41–2(c). Racketeering is defined in the state statute as any one of a number of crimes, including "fraud in the offering, sale or purchase of securities." N.J.S.A. 2C:41–1(1)(p). A pattern of racketeering activity requires: (1) engaging in at least two incidents of racketeering conduct ... within [ten] years ... after a prior incident of racketeering activity; and (2) a showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated events. *See*

N.J.S.A. 2C:41–1(d)(2); *see also H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232–33, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989).

N.J.S.A. 2C:41–1 recites that "the Legislature recognized that the existence of organized crime and organized crime type activities presents a serious threat to the political, social, and economic institutions of the state" and that "... effective criminal and civil sanctions are needed to prevent, disrupt and eliminate the infiltration of organized crime type activities ... into the legitimate trade." Like its federal counterpart, the New Jersey State RICO statute is premised on the need to address the influence of organized crime upon New Jersey businesses. *See In Matter of Doe*, 294 N.J.Super. 108, 682 A.2d 753 (L. Div. 1996). Based on this purpose, and also on the same reasoning as that which led the Congress to enact the PSLRA, this Court would be inclined to bar a state RICO action based on allegations of securities, mail or wire fraud. However, the Court is constrained by its deference to the New Jersey state legislature, which has yet to follow Congress and focus the statute more narrowly to its enumerated purpose. Accordingly, the Court will address the plaintiffs' state RICO claims on the merits.

▮ Fraud has generally been defined as "a material representation of a presently existing or past fact, made with knowledge of its falsity and with the intention that the other party rely thereon, resulting in reliance by that party to his detriment." *Jewish Center v. Whale*, 86 N.J. 619, 624, 432 A.2d 521 (1981); *see also Louis Schlesinger Co. v. Wilson*, 22 N.J. 576, 585–86, 127 A.2d 13 (1956). The circumstance when no affirmative misrepresentation is made does not bar relief predicated on a claim of fraud, because suppression of the truth when it should be disclosed is equivalent to an expression of a falsehood. *See Baldasarre v. Butler*, 254 N.J.Super. 502, 520, 604 A.2d 112 (App. Div.1992), *aff'd in part and rev'd on other*

*grounds,* 132 N.J. 278, 625 A.2d 458 (1993).

The plaintiffs claim that the statement in the May 24, 1995 United Counties–Meridian merger announcement that the surviving bank would be headquartered in Cranford, New Jersey was fraudulent because the Cranford office was closed after the Meridian–Corestates merger. They also claim that this statement was made to cause them to believe that their jobs were secure, to induce them to remain in the bank's employ, and to persuade them to support the merger. The plaintiffs further argue that the October 10, 1995 Meridian–Corestates merger agreement was fraudulent. The merger agreement stated that the salary, wage, hours and benefits package to which all Meridian employees would be entitled to participate would be substantially on the same terms and conditions as that offered to Corestates' employees. Corestates later fired the plaintiffs, and informed them that the bank planned to give them the United Counties–Meridian severance package rather than the more generous Corestates package. The plaintiffs also assert that the two corresponding proxy statements and prospectuses were fraudulent and in furtherance of the purpose to deceive.

The United Counties–Meridian merger agreement stated that employees who were involuntarily terminated as a result of *that* merger would be entitled to a certain severance package. The Meridian–Corestates merger agreement stated that employees who were involuntarily terminated as a result of *that* particular merger would be given a different, more generous severance package. The initial argument of the plaintiffs is that because they were fired by Corestates after the Meridian–Corestates merger, they were not fired as a result of the United Counties–Meridian merger, and therefore are not bound to the United Counties–Meridian severance package. On the contrary, they contend, they were fired as a result of the Meridian–Corestates merger and are entitled to its corresponding severance package.

The defendants respond that even if this is so, the plaintiffs became Meridian employees, at the earliest, on February 23, 1996, when the United Counties–Meridian merger was consummated. When the Meridian–Corestates merger was finalized on April 9, 1996, they continue, the plaintiffs had only been employed in a covered company less than two months. The defendants' argument concludes that because the Partnership Guarantee contract required at least six months service to be eligible for the Meridian–Corestates package, none of the plaintiffs was eligible and Corestates is being generous to even pay the plaintiffs according to the United Counties–Meridian severance agreement.

■ Among other things, the New Jersey RICO statute requires proof of a "pattern of racketeering activity." *State v. Ball,* 141 N.J. 142, 163, 661 A.2d 251 (1995), *cert. denied, Mocco v. New Jersey,* 516 U.S. 1075, 116 S.Ct. 779, 133 L.Ed.2d 731 (1996). The predicate acts must therefore (1) be related, and (2) pose a threat of continued criminal activity. *Id.* at 168, 661 A.2d 251. Plaintiffs contend that a continuing threat of racketeering activity is evidenced by the fact that "defendants continue to illegally withhold severance benefits to which plaintiffs and other members of the putative class are entitled." (Pl. Br. in Opp. to Mot. to Dismiss at 10). They assert that "[t]his illegal activity will continue through further instances of, *inter alia,* mail and wire fraud, as defendants continue to transmit communications regarding severance benefits to plaintiffs and others by mail and wire." *Id.* This contention is not supported by the evidence. Although the defendants may disseminate information in the future about severance benefits, there is no indication that such information will be false or misleading. The plaintiffs' bald assertion does not convince the Court that it is true.

■ Continuity may be established "where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.'" *H.J. Inc.,* 492 U.S. at 243, 109 S.Ct. 2893; *see also Tabas,* 47 F.3d at 1295 ("if the predicate acts have been a regular way of conducting defendant's legitimate business over a long period in the past, the RICO pattern has been satisfied"). Furthermore, proof that the defendant participated in multiple schemes is not necessary; involvement in a single ongoing scheme may under certain circumstances be sufficient to show continuity.[3] *Id.* at 240, 109 S.Ct. 2893.

Plaintiffs' argument that mail and wire fraud are part of CoreStates' regular manner of conducting business is unpersuasive. Plaintiffs charge that "[a]lthough the *purpose* of the enterprise is to engage in a legitimate banking business, since in or about [sic] May 1995, part of the *regular conduct* of business has included using the mails and wires to fraudulently deny plaintiffs severance benefits to which they are justly entitled." (Pt. Br. in Opp. to Mot. to Dismiss at 10) (emphasis in original). These factually deficient allegations do not support this assertion. The complaint alleges the dissemination of only five or six communications that were fraudulent or misleading over a relatively short period of time. This falls short of being the "regular conduct" of the bank. The criticized activities constitute a small "snapshot" in the workings of CoreStates dealing specifically with the manner in which defendants conducted themselves during the process of a corporate merger. The complaint offers nothing to suggest that this type of activity describes the conduct of the bank

in anything but this narrow and completed context. As the Seventh Circuit noted in *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* "[a] threat of continuity cannot be found from bald assertions that '[defendant] continues his racketeering activities.'" 20 F.3d 771, 783 (7th Cir.1994).

■ Notwithstanding this, the New Jersey RICO statute, unlike its federal counterpart, does not put as much emphasis on "continuity" to establish a pattern of racketeering activity, but instead relies on "relatedness." *State v. Ball,* 141 N.J. 142, 166–69, 661 A.2d 251 (1995). The New Jersey Supreme Court has pronounced that "the primary criterion of New Jersey's 'pattern of racketeering activity' is relatedness." *State v. Ball,* 141 N.J. 142, 169, 661 A.2d 251 (1995). The *Ball* court also called for "a broad standard involving the totality of all relevant circumstances, which *may* include continuity." *Id.* (emphasis added). The relatedness standard of the New Jersey RICO statute is found in subsection 1(d)(2), which enumerates several factors that may combine or be "otherwise interrelated" to establish a pattern of racketeering activity. See *id.; see also* N.J.S.A. 2C:41–1(d)(2); *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232–33, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989). Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *See H.J. Inc.,* 492 U.S. at 240, 109 S.Ct. at 2901.

■ Had the two bank mergers occurred entirely independent of each oth-

---

**3.** In *Barticheck v. Fidelity Union Bank/First Nat'l State,* 832 F.2d 36 (3d Cir.1987), the Third Circuit established six factors to be considered in the determination of whether a pattern has been shown: (1) the number of unlawful acts; (2) the length of time over which the acts were committed; (3) the similarity of the acts; (4) the number of victims; (5) the number of perpetrators; and (6) the

character of the unlawful activity. *See id.* at 39. Because *Barticheck* was decided before *H.J. Inc.,* the continued viability and applicability of these factors is unclear. The Third Circuit has noted that "the *Barticheck* factors are best viewed as analytical tools available to courts when the issue of continuity cannot be clearly determined." *Tabas,* 47 F.3d at 1296 n. 21.

er—as to participants or time periods—the Court might be more inclined to find that the acts complained of by the plaintiffs were not related. However, the three banks were in negotiations for the two mergers at the same time. The announcement of the merger agreements and the dissemination of the proxy statements and prospectuses were not only related in their methods of commission, but also in their purposes, participants and results. The participants in each merger were aware of the other merger and of the certain results for various employees. Although the plaintiffs' case for continuity is not particularly strong, they have sufficiently alleged relatedness. On a 12(b)(6) motion to dismiss, the Court must accept all allegations of the plaintiffs as true. The motion to dismiss the plaintiffs' New Jersey state RICO claims is denied.[4]

### 3. *Plaintiffs' Standing to Bring the Securities Claims*

The defendants argue that the securities claims of most of the plaintiffs must be dismissed because they lack standing to bring such claims. This contention stems from these plaintiffs not owning stock in any of the companies involved in the subject mergers. The Complaint acknowl-edges that only some of the plaintiffs owned such stock, (*See* Compl., ¶ 6). When considering a motion to dismiss based on standing, it is appropriate to consider affidavits and certifications which are properly before the Court. *See Region 8 Forest Serv. Timber Purchasers v. Alcock*, 993 F.2d 800, 806 (11th Cir.1993), *cert. denied*, 510 U.S. 1040, 114 S.Ct. 683, 126 L.Ed.2d 651 (1994); *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir.1995). The defendants have supplied an affidavit that states that only nine of the eighty plaintiffs owned stock in United Counties, while none of the plaintiffs owned stock in Meridian or Corestates during the relevant times. (*See* McLean Certif., ¶¶ 3–5).

Count III of the plaintiffs' complaint alleges violation of Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k ("Section 11"). Count IV alleges violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("10(b)") and Rule 10b–5, which was promulgated thereunder. Count V alleges violation of Section 12(2) of the Securities Exchange Act, 15 U.S.C. 77l(2). ("Section 12"). Section 11(a) states that a suit brought under its provisions can only be brought by "any

---

4. As for the May 1996 "Q & A" fax sheet, the plaintiffs argue that it also constitutes a predicate act under RICO. The Court finds that there is nothing in the complaint to indicate that anything in the "Q & A" sheet was at all fraudulent. Though plaintiffs try to fold this communication into what they term "defendants' overall scheme to defraud plaintiffs," as alleged in the complaint, the information in the "Q & A" sheet was of a substantially different nature than that contained in the other communications. Whereas defendants' other official statements allegedly contained false information designed to induce plaintiffs and others to act to their detriment, the complaint merely asserts that through the "Q & A" publication, plaintiffs were informed (1) that they would be terminated and (2) that CoreStates did not intend to provide them with the enhanced severance benefits set forth in the Partnership Guarantee.

The "Q & A" sheet, as described in the complaint was not fraudulent and cannot be viewed as another in a series of steps de-signed to induce plaintiffs to act to their detriment. Indeed, even if the Court considers the description of the "Q & A" sheets set forth in plaintiffs' RICO Case Information Statement, it need not, as plaintiffs contend, accept their characterization of statements therein as "materially false and misleading ... regarding plaintiffs entitlement to CoreStates' severance benefits." As described, the Q & A sheet was simply a statement of CoreStates position on the issue of plaintiffs' entitlement to severance benefits. If anything, it was the means by which defendants informed plaintiffs of the allegedly criminal activity that had theretofore been concealed. It did not induce plaintiffs to act to their legal injury; instead, it was the mechanism through which—in the words of the complaint—frauds were revealed. As such, from the facts alleged in the complaint, the Court views the Q & A sheet not as an additional predicate act of fraud, but rather, as the catalyst that prompted plaintiffs to take action to protect their interests.

person acquiring such security." 15 U.S.C. § 77k(a): *Pompano–Windy City Partners v. Bear Stearns & Co.*, 794 F.Supp. 1265, 1286 (S.D.N.Y.1992). Section 12(2) provides that any person that violates its provisions "shall be liable to the person purchasing such security from him." 15 U.S.C. 77*l*; *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682 (3d Cir.), *cert. denied*, 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991). "An investor must purchase or sell a security in order to recover under Section 10(b) ... and Rule 10b–5 thereunder." *Allard v. Arthur Andersen & Co.*, 957 F.Supp. 409, 420 (S.D.N.Y.1997).

■ The defendants finally assert, and the plaintiffs do not deny, that the only plaintiffs who owned stock in any of the relevant banks were George Weiss, Sandhya P. Shah, Joan Moran, James Hickman, Thomas Iorio, Kenneth Rowinski, Lucy Ferri, Frank Roes, William Metz, and George Way. (*See* Def. Reply Br. in Supp. Mot. Dismiss at 15).[5] Therefore, they argue, the securities claims in Counts III through V must be dismissed as to all other defendants. The Court agrees. Because they were neither owners, purchasers nor sellers of securities in any of the banks involved, the motion to dismiss the securities law claims in Counts III, IV and V of the complaint is granted with prejudice against all plaintiffs except the ten named above. As to the other plaintiffs, who are or were at relevant times holders of securities, the Court will address their securities claims on the merits.

4. *Whether the Shareholder Plaintiffs' 10b–5 Claim Should be Dismissed*

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the use of fraudulent schemes or devices in connection with the purchase or sale of securities. This section of the Act makes it unlawful to "employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention" of any rule promulgated by the SEC designed to protect the investing public. To implement the statute, the Commission enacted Rule 10b–5, violation of which gives rise to a private cause of action. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *rehearing denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), *rehearing denied*, 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975). Rule 10b–5, in turn, makes it unlawful: (1) "To employ any device, scheme, or artifice to defraud," (2) "[t]o make any untrue statement of a material fact" or to omit to state a material fact so that the statements made "in light of the circumstances," are misleading, and (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.

■ This tort, although statutory in nature, sounds in the common law of fraud and deceit and retains, in modified form, the common law elements of duty, breach, causation, and damage. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 547 (5th Cir.1981) (10b–5 claim derived from common law action for deceit), *modified on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The plaintiff must prove knowledge by the defendant, intent to defraud, misrepresentation or failure to disclose, materiality of the information and, injurious reliance by the plaintiff. *Thomas v. Duralite Co.*, 524 F.2d 577 (3d Cir.1975); *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402 (3d Cir.), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). More precisely, these elements form the following test. To make a claim under 10b–5, a plaintiff must allege (1) a

---

5. The Court notes that although the defendants consistently state that "nine" of the plaintiffs owned stock, they have, in their reply brief, supplied the names of ten plaintiffs/stockholders.

misstatement or an omission (2) of a material fact (3) made with scienter by a defendant (4) upon which plaintiff relied (5) that proximately caused his injury. *See Kline v. First Western Government Secs., Inc.*, 24 F.3d 480, 487 (3d Cir.), *cert. denied*, 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994); *Huddleston*, 640 F.2d at 543.

 Federal Rule of Civil Procedure 9(b) mandates that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." A fraud complaint must state "the who, what when, where and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990). Congress, finding that Rule 9(b) "ha[d] not prevented abuse of securities laws by private litigants," H.R. Conf. Rep. No. 104–369, 104th Cong., 1st Sess., at 41 (1995), enacted the PSLRA, which made certain changes to the pleading standards under the securities laws. Conference Report at 31. One of the protections provided by the enactment of the PSLRA was section 21D(b)(2) of the Exchange Act, 15 U.S.C. § 78u–4(b)(2), which provides:

> In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

 The required state of mind is scienter. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter requires both intentional conduct and a form of recklessness. *See In re Phillips Petroleum Securities Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989). "Recklessness is defined as an extreme departure from the standard of ordinary care ... which presents a danger of misleading ... that is either known to the defendant or is so obvious that the

actor must be aware of it." *Id.* In an action for securities fraud, the complaint must specify each statement alleged to have been misleading and the reasons why the statement is misleading. *See* 15 U.S.C. § 78u4(b)(1). The complaint must particularize facts giving rise to a strong inference that the misstatements were made purposely or in reckless disregard of the truth. *See* 15 U.S.C. § 78u–4(b)(2).

 The plaintiffs' complaint alleges various fraudulent statements or omissions. The first allegation is that in a May 24, 1995 press release, Meridian and United Counties said that the bank resulting from their merger would be headquartered in Cranford, New Jersey. (*See* Compl. ¶ 40) There is no evidence that this statement, made almost a year before the Meridian–Corestates merger, was false or misleading when it was made. The conclusory assertion that "the above statements ... were made with the specific knowledge of their falsity and for the purpose of deceiving United Counties employees ..." (Compl.¶ 42) does not convey a strong inference that the defendants acted with the intent to defraud the plaintiffs. The complaint also alleges that Meridian and United Counties officials announced that, as the resultant bank would be headquartered in Cranford, New Jersey, individuals employed through that location would be secure in their jobs. (*See* Compl. ¶ 41). This allegation does not meet the pleading requirements of Rule 9(a) or the PSLRA. It neither includes who, what, when where nor how.

 The next allegation of fraud is that the Meridian–Corestates Merger Agreement and proxy statement were false and misleading because they stated that the salary, wage, bonus and benefits package to which all Meridian employees would be entitled ... would be on substantially the same terms and conditions as those offered to Corestates employees. (*See* Compl. ¶ 52). While this allegation does include who, what, when, where and

how, it suffers from another infirmity. The plaintiffs' claim does not include facts that give rise to a strong inference that the statements were made with the intent to defraud or in reckless disregard of the truth. A plaintiff cannot simply couple a factual statement with a conclusory allegation of fraudulent intent to adequately plead scienter. *See Norwood Venture Corp. v. Converse, Inc.*, 959 F.Supp. 205, 208 (S.D.N.Y.1997). The defendants, for their part, argue that this statement was true when made and remains true today. They argue that these plaintiffs were not Meridian employees when the statement was made and had been Meridian employees for less than two months when the Meridian–Corestates merger was completed. They continue to argue that the plaintiffs, like any other Meridian or Corestates employee with less than six months of employment with either bank, were not eligible for severance benefits under the Partnership Guarantee Contract. While the plaintiffs may reasonably disagree with Corestates' interpretation of these provisions and statements, their complaint does not state facts with particularity that would allow the Court to infer that the defendants made the statements in any merger agreement, proxy statement, prospectus, or severance provision while either knowing that they were false or with a reckless disregard for their truth. Accordingly, the shareholding plaintiffs' section 10(b) and Rule 10b–5 claims are dismissed without prejudice.

5. *Whether the Shareholder Plaintiffs' Section 11 Claims Must be Dismissed*

Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, provides for damages caused by a false or misleading registration statement. If the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," any person who acquired that security may sue every person who signed the registration statement, every director or partner, every professional named as having prepared or certified the registration statement or any valuation used in connection with it, and every underwriter. Section 11 does not require a showing of intent or scienter. Unless it is proved that at the time of the acquisition the purchaser of the security knew of the untruths or omissions in the registration statement, all of the above persons are liable to anyone who acquired the security. The person who acquired the security is not required to prove reliance upon the untrue statements contained in the registration statement unless that person acquired the security after the issuer made available an earning statement covering a period of at least 12 months beginning after the effective date of the registration period. Because the securities at issue here were not acquired after the release of such an earning statement, there is no reliance requirement for a § 11 claim.

Under § 77k(e), damages are calculated as the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and:

> the value thereof as of the time such suit was brought, or

> the price at which such security shall have been disposed in the market before suit, or

> the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security and the value thereof as of the time such suit was brought.

The defendants argue that because Section 11 limits damages to the diminution in the value of the securities involved, the plaintiff must at least plead, if not prove, such diminution in order to state a valid Section 11 claim. (*See* Def. Br. in Supp. Mot. to Dismiss at 30). They assert that because the complaint is devoid of any allegations that the value of their stock

held by the ten plaintiff-shareholders was less at the time of filing suit than at the time of the merger, or that any of their stock was sold before this suit was filed, their Section 11 claims are invalid. (*See id.* at 30–31) *See PPM America, Inc. v. Marriott Corp.*, 853 F.Supp. 860, 876 (D.Md.1994) (plaintiffs have no section 11 claim when they sold securities at a profit); *Grossman v. Waste Management, Inc.*, 589 F.Supp. 395, 415–17 (N.D.Ill.1984) (section 11 claim legally insufficient when the value on date of filing exceeds price paid for securities).

■ The plaintiffs counter this argument by stating that "the Court must assume that all facts alleged by the plaintiff are true, and ... consider only whether plaintiffs have established the elements necessary to state a claim." (Pl. Br. in Opp. to Motion to Dismiss at 29); What the plaintiffs have plead in regard to Section 11 is that "[i]n their Complaint, plaintiffs have properly alleged that they and others sustained injuries pursuant to misrepresentations in the registration statements disseminated by the named defendants." (*See* Pl. Br. in Opp. to Motion to Dismiss at 29, Compl. ¶ 75). The problem with the complaint and the plaintiffs' argument is that, under Section 11, it is not enough to merely plead injuries, the plaintiffs must plead a certain kind of injury. Section 11 only gives damages for a diminution in the value of securities caused by the false or misleading statements or omissions of the defendant. Absent such damages, the plaintiffs have no legally cognizable Section 11 claim. On a Rule 12(b)(6) motion to dismiss, the claimant must set forth sufficient information to outline the elements of her claims or to permit inferences to be drawn that these elements exist. *See* Fed.R.Civ.P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The shareholding plaintiffs have not met this burden with regard to their Section 11 claims. The motion to dismiss the shareholding plain-

tiffs' Section 11 claims is granted without prejudice.

6. *Whether the Shareholder Plaintiffs' Section 12(2) Claim must be Dismissed*

Section 12(a)(2), 15 U.S.C. § 77*l*(a)(2) subjects to liability any person who offers or sells a security by means of a false or misleading prospectus or oral communication in interstate commerce or through the mails. This person is subject to liability to "the person purchasing such security from him, who may sue ... to recover the consideration paid for the security with interest, less the amount of any income received thereon, upon the tender of the security, or damages if he no longer owns the security." *Id.*

The defendants argue that because the plaintiffs have neither offered to tender the securities in question and demanded rescission, nor alleged that they have sold the securities at a loss, their Section 12 claim must be dismissed. (*See* Def. Br. in Supp. Mot. to Dismiss at 31). The plaintiffs counter that "the request for rescission in the Complaint is an implicit tender and is sufficient to satisfy the statute." (Pt. Br. in Opp. Mot. to Dismiss at 30); *Wigand v. Flo–Tek, Inc.*, 609 F.2d 1028, 1035 (2nd Cir.1979). In *Wigand* the Court found that the plaintiffs had made a "demand" for rescission and that they "had reason to believe that an offer of tender would be pointless." 609 F.2d at 1035. There have been other cases which have determined that an offer to tender securities contained in the complaint will satisfy Section 12. *See e.g., Chapman v. Dunn*, 414 F.2d 153 ( 6th Cir.1969); *Moses v. Michael*, 292 F.2d 614 (5th Cir.1961); *Stadia Oil & Uranium Co. v. Wheelis*, 251 F.2d 269 (10th Cir.1957). Nonetheless, these cases do not support the plaintiffs' argument of constructive tender. *Chapman* states that there was tender of the securities in the complaint but does not elaborate further. *See* 414 F.2d at 160. In *Moses* the Court found that physical

tender of the securities was impossible because it was required that the securities be filed in a Registry of Deeds Office. *See* 292 F.2d at 619. In *Stadia* the Court found that the plaintiffs had made an explicit offer of tender in their amended complaint and had deposited the certificates with the clerk of the court. *See* 251 F.2d at 273–74.

 The plaintiffs' complaint in this case reads that "[a]ll of the defendants are liable to plaintiffs who, as a result, are entitled either to rescind their purchases of Corestates securities and recover the consideration paid for such securities with interest thereon, or to receive payment from the defendants for damages sustained." (Compl.¶ 85). The Court finds that this statement is not an adequate demand for rescission which will satisfy Section 12. The complaint states the obvious, that the plaintiffs may have options on how to proceed for damages under the statute. From a review of the statute and case law, the Court finds that to make an offer to tender in a complaint which will satisfy Section 12, the plaintiff must make an explicit demand for rescission, an offer to tender, in the complaint. The Court further notes that such a demand is well supported when any alternative method of offer or demand is impossible or pointless. The plaintiffs here have satisfied neither of these prerequisites. The motion to dismiss the plaintiff shareholders' Section 12(2) claim is granted without prejudice.

7. *Whether the Plaintiffs' New Jersey State Securities Law Claims Must be Dismissed*

N.J.S.A. 49:3–71(a) provides that any person who

\* \* \*

(2) [o]ffers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading the buyer not knowing of the untruth or omission, or

(3) "offers, sells or purchases a security by employing any device, scheme or artifice to defraud," or

(4) [o]ffers, sells or purchases a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person . . . ,

\* \* \*

(5) . . . is liable as set forth in subsection (c) of this section.

 Subsection (c) declares that "[a]ny person who offered, sold or purchased a security . . . in violation of [subsection (a) ] is liable to that person, who may bring an action . . . to recover the consideration paid for the security . . . together with interest . . . from the date of payment of the consideration for the . . . security, and costs, less the amount of any income received on the security . . . or for damages if he no longer owns the security." N.J.S.A. 49:3–71(c). The New Jersey statute envisions damages for securities fraud similar to those available under the federal securities laws. If he still owns the securities, an aggrieved plaintiff can recover the amount paid for the securities less any income received. If he no longer owns the securities, he can recover damages. The plaintiffs have not plead or alleged that they have offered the securities for tender and are entitled to rescission, nor that they no longer own the securities and are entitled to damages. The statute also requires that "[i]f any claim is brought for violation of [subsection (a) ] the person who bought the security . . . shall sustain the burden of proof that the seller . . . knew of the untruth or omission and intended to deceive the buyer . . . and that the buyer . . . has suffered a financial detriment." N.J.S.A. 49:3–71(b)(1). The plaintiffs' appear to claim that they have suffered a financial detriment because they will not receive the more generous severance benefits to which they believe they

are entitled. This is not the kind of injury envisioned by the New Jersey securities fraud statute. The Court does not have reason to believe that the New Jersey statute is any more or less exacting than the corresponding federal statutes. *Compare Wiley v. Hughes Capital Corp.*, 746 F.Supp. 1264, 1301 (D.N.J.1990) (the court granted a motion to dismiss because it had no apparent reason to believe that the requirements of the Florida Securities fraud statute were less stringent than federal laws). Securities laws, both on the federal and state level, require injuries that are substantially related to the purchase, or fluctuations in value, of the security. These laws do not give private rights of action for every peripheral or extenuated injury claimed to flow from an alleged instance of securities fraud. The motion to dismiss the shareholding plaintiffs' New Jersey state law securities claims is granted without prejudice.

8. *Whether the Plaintiffs' Common Law Claims are Preempted by ERISA*

By Counts V through VIII of their complaint, the plaintiffs claim that Corestates breached its contract to provide additional severance benefits to plaintiffs, (Compl.¶¶ 106–109), fraudulently misrepresented the amount of the severance benefits available to plaintiffs, (Compl. V ¶ 110–116) and—because of the denial of the additional severance benefits to plaintiffs—caused intentional infliction of emotional distress. (Compl.¶¶ 117–120).

With exceptions not relevant here, section 514(a) of ERISA provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Initially, the defendants assert that the Corestates severance benefit program is an "employee benefit plans" for the purposes of ERISA because it creates an "ongoing administrative scheme" for the provision of employee benefits. (Def. Br. Supp. Mot. to Dismiss at 35); *See*

*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). They contend that the Corestates severance benefit plan creates an ongoing scheme because it requires the bank to keep detailed participation and eligibility criteria, delegates its administration to a Plan Administrator, and provides participants with a comprehensive claims procedure. *Accord Deibler v. United Food and Commercial Workers' Local Union 23*, 973 F.2d 206, 210 (3d Cir.1992) (union's severance policy is an ERISA plan); *Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir.1989) (plan providing severance benefits for certain executives is an ERISA plan); *Jones v. AT & T Co.*, 798 F.Supp., 1137, 1142 (E.D.Pa.) *aff'd*, 981 F.2d 1247 (3rd Cir. 1992) (plan that provided severance payments to certain employees who were adversely affected by headcount reductions is an ERISA plan). The plaintiffs do not dispute that the Corestates severance benefit plan is an ERISA plan. Rather, they argue that their common law claims do not "relate to" ERISA. (Pt. Br. in Opp. to Mot. to Dismiss at 32–33). They assert that these claims and their underlying common law theories, have too tenuous and remote a connection to the employee benefit plan for preemption to apply. (*See Id*).

A law "relates to" an employee benefit plan if it has a connection with or reference to such a plan. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). The plaintiffs rely on *Shaw* and other cases to declare that "those laws which make an explicit 'reference to' an ERISA plan, or are specifically designed to affect employee benefit plans, are preempted under Section 514(a)". *See id.; see also Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47–48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985). This contention does not decide the present question, however, because it is not the equivalent of saying

that a plan which does not make such an explicit reference to or is not specifically designed to affect employee benefit plans escapes preemption. The defendants argue that the plaintiffs' common law causes of action relate to the ERISA plan because they would provide an alternative cause of action to the plaintiffs to collect benefits protected by ERISA. *Accord Bernatowicz v. Colgate–Palmolive* Co., 785 F.Supp. 488, 492 (D.N.J.), *aff'd,* 981 F.2d 1246 (3d Cir.1992); *Henry v. Black & Decker, Inc.,* 779 F.Supp. 778, 782 (D.N.J.1991).

█ The intent of Congress is the critical factor to decide whether common law claims are preempted by ERISA. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 656, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 840, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). Congress enacted ERISA preemption to encourage the formation of employee benefit plans by standardizing the regulatory requirements applicable to plan administrators. *See Pilot Life Ins.,* 481 U.S. at 54, 107 S.Ct. 1549; *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 9, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). The *Fort Halifax* court held that Congress intended ERISA preemption to afford employers uniform regulation of the complex arena of benefit plan administration. 482 U.S. at 11–12, 107 S.Ct. at 2211.

█ One of the primary purposes of ERISA preemption is to "[eliminate] the threat of conflicting and inconsistent State and local regulation," 120 Cong. Rec. 29197 (1974).[T]his principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law.' *Id.* at 29933. The defendants argue that for the Court to hear the plaintiffs' common law claims would fly in the face of Congressional goals: To hear these claims could result in a determination that the plaintiffs have no cause of action to receive the enhanced severance benefits under ERISA, but at the same time have certain causes of action to recover the benefits through their state common law claims. Such a potential result would defeat the Congressional purposes of encouraging the formation of employee plans by standardizing regulatory requirements, and eliminating the threat of conflicting or inconsistent state regulation. In order for the plaintiffs to prevail on these common law claims, the Court would have to look into the very essence of the severance benefit plans and determine whether the defendants had a particular severance-defeating motive in their allegedly fraudulent actions. Such judicially created causes of action "relate to an ERISA plan." *Accord Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 140, 111 S.Ct. 478, 483, 112 L.Ed.2d 474 (1990).

Circuit Courts, without intercession by our Supreme Court, have held that state law challenges to the denial of benefits under an employee benefit plan are preempted by ERISA. *See e.g., Gilbert v. Burlington Industries, Inc.,* 765 F.2d 320, 326–28 (2d Cir.1985), *aff'd,*477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 558 (1986) (state law claim seeking to obtain severance pay provided by employee benefit plan preempted); *Powell v. Chesapeake & Potomac Telephone Co.,* 780 F.2d 419, 421–22 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986) (state law claims for intentional infliction of emotional distress, breach of covenant of good faith and fair dealing, breach of contract, and unfair trade practices arising out of denial of disability benefits preempted); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1214–16 (8th Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981) (state law claims for tortious interference with contract and fraud arising out of denial of severance pay preempted). Accordingly, the Court finds that all of the plaintiffs' common law claims are preempted by ERISA.[6]

9. *The Cross Motions for Summary Judgment on Count One of the Plaintiffs' Complaint*

Count One of the amended complaint alleges that the defendants' actions violate ERISA. The parties have filed cross motions for summary judgment on this count.

First, procedurally, Point V of the defendants' reply brief contains a point heading which states that the plaintiffs' motion "must be denied." Such a sur-reply paper is not permitted under L. Civ. R. 7.1 unless the court grants specific permission at its own discretion. *See In re Data Access Systems Securities Litigation,* 103 F.R.D. 130, 149 (D.N.J.1984); *American Tel. & Tel. Co. v. Nos Communications,* 830 F.Supp. 225, 230 n. 1 (D.N.J.1993). The Court finds that Point V of the defendants' reply is an unauthorized sur-reply and strikes it.

■ Secondly, Fed.R.Civ.P. 56(e) requires that "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached [to the corresponding moving papers] or served [with the corresponding moving papers]". Fed. R.Civ.P. 56(f) allows the Court, when the party opposing the motion cannot present by affidavit facts essential to justify the party's opposition, to either refuse the application for judgment, order a continuance to permit affidavits to be obtained or depositions to be had, or make such other order as is just. The defendants have submitted a Fed.R.Civ.P. 56(f) affidavit with service of their last reply brief. The plaintiffs complain that this late filing of the affidavit prevents them from having a reasonable opportunity to address the Fed.

R.Civ.P. 56(f) claim, and is egregious when the defendants have offered no justification for this violation of the rules. They further declare that the defendants' last minute submission of the affidavit is not within the contemplation of Rule 56(f) and should be stricken. The Court agrees and strikes the affidavit of defendants' counsel.

*Legal Standard for Summary Judgment*

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *See id.* at 248, 106 S.Ct. 2505. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party opposing a motion for summary judgment must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Sound Ship Building Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976). At the summary judgment stage the court's function is not to weigh the

---

**6.** The plaintiffs argue that the Court must first decide whether their cause of action states an adequate claim for relief under ERISA. (Pt. Br. in Opp. to Motion to Dismiss at 37–38); *Curtis v. Nevada Bonding Corp.,* 53 F.3d 1023, 1027 (9th Cir.1995). Courts in this circuit, however, have dismissed both an ERISA claim for benefits and the related common law claims on preemption grounds. *See, e.g.,*

*Bernatowicz v. Colgate–Palmolive Co.,* 785 F.Supp. 488, 492 (D.N.J.), *aff'd,* 981 F.2d 1246 (3d Cir.1992); *Crumley v. Stonhard, Inc.,* 920 F.Supp. 589, 594–96 (D.N.J.1996). This Court finds that dismissal of the plaintiffs' common law claims is not predicated on a finding that they state an adequate claim for relief under ERISA.

evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Wahl v. Rexnord, Inc.* 624 F.2d 1169, 1181 (3d Cir.1980).

The plaintiffs do not refer to a specific provision of ERISA in Count I of their complaint, although the Court assumes that they seek to invoke section 1132(a)(1) which provides for, *inter alia,* a cause of action by individual plan beneficiaries to recover severance benefits which have been improperly denied.

■■■ A court may not entertain an ERISA section 1132(a)(1)(B) claim for benefits unless the plaintiff has complied with and exhausted all administrative prerequisites required by the plan itself. *See Weldon v. Kraft, Inc.,* 896 F.2d 793, 800 (3d Cir.1990). The defendants assert that section 9.01 of the severance plan at issue includes a procedure for applying for severance benefits. They further argue that because none of the plaintiffs filed the required application for benefits with the Corestates Human Resources Officer, each is precluded from bringing an ERISA action based on denial of plan benefits.

The plaintiffs counter that they are not barred from bringing an ERISA action by their failure to follow the plan's procedures. They make this claim by relying on the exception that such failure is excused where resort to administrative processes would be futile. *See Berger v. Edgewater Steel Co.,* 911 F.2d 911, 916 (3d Cir.1990). They argue that the exception applies when, as here, the employer makes it clear to the employees that it has a "fixed policy" of denying benefits under certain circumstances, such as with respect to a particular group, or as a "blanket denial." *Id.; see also Goclowski v. Penn Central Transp. Co.,* 571 F.2d 747, 758 (3d Cir.1977).

*Berger* involved former employees of a steel company who brought an ERISA suit against their former employer. *See* 911 F.2d at 913. The defendants moved for summary judgment because the plaintiffs had not exhausted internal administrative remedies. *Id.* at 915. The court found that three of the employees were excused because their resort to internal administrative remedies would have been futile. *Id.* at 916–17. A fourth employee was barred from bringing an ERISA action because he had not exhausted such remedies. *Id.* at 917. As to those employees who were allowed the exception, the court acknowledged that they had "made their desire for [the employment benefit] plain to the responsible company officials," that "the company had adopted a policy of denying all applications for [the employment benefit]," and that the employer had failed "to comply with the Plan's administrative procedures." *Id.* Considering all of these factors, the court concluded that "any resort to the administrative process would have been futile." *Id.* As to the employee denied the exception, the court found that he was precluded from making an ERISA claim because "he never even asked for [the employment benefit]". *Id.*

In *Goclowski* a group of railroad employees sued their union and their employer, claiming that an allegedly invalid agreement entered into by the defendants adversely affected seniority rights. *See* 571 F.2d 747 (3rd Cir.1977). The court found that the plaintiffs had repeatedly sought redress for harms caused by the Union. *Id.* at 758. The plaintiffs met with union officials, both at the International and the Local, and asked them to rescind the agreement. *Id.* The attempts of the plaintiffs were rebuffed by the defendants in each instance. *Id.* Accordingly, the court held that "requiring the plaintiffs to undertake a time-consuming formal appeal would serve no purpose." *Id.*

Here, the defendants assert, and the plaintiffs do not deny, that none of the

eighty plaintiffs in this case filed an application for enhanced benefits. (*See* Def. Br. in Supp. Mot. to Dismiss at 18). Therefore, they argue, the plaintiffs could not have received a denial of benefits, or filed and lost an appeal as required under section 9.01 of the severance plan. The plaintiffs counter that they were informed by Corestates "ahead of time" that filing an application for enhanced partnership benefits would be futile. (Pt. Br. in Opp. to Mot. to Dismiss at 16). As evidence of this, they assert that the Q & A distributed by Corestates informed them that they would not be eligible for enhanced benefits and that "filing such an application would be in vain." (*Id.*)

 A perusal of the Q & A and related documents does not convince the Court that the plaintiffs' contentions are correct. Along with the Q & A, each plaintiff received a letter which informed him of his employment termination. (See McCarthy Aff., Ex. G) The letter also contained a "severance schedule," in which severance benefits were calculated according to the United Counties–Meridian severance agreement. (*See id.*) There was also a question in the Q & A that asked "Why am I not eligible for 'Partnership Severance?'" (*Id.*, Ex. H) The answer was "[t]he severance scheduled for United Counties employees is outlined in the merger agreement between Meridian and United Counties Trust Company signed may 23, 1995. Corestates is honoring that agreement." (*Id.*) The plaintiffs claim that this information illustrates that any resort to internal administrative remedies would have been futile, and such futility excuses their failure to exhaust remedies.

The Court does not agree that these two communications are evidence of futility sufficient to excuse the plaintiffs' failure to comply with ERISA's exhaustion requirements. In *Berger*, the plaintiffs had already been told that as of a certain date, the employment benefits at issue would be eliminated. *See Berger v. Edgewater Steel Co.*, 911 F.2d 911, 914–15 (3d Cir.1990).

The plaintiffs were also told by the employer that they would not receive the employment benefit to which they felt they were entitled. *Id.* at 915. Rejecting a futility argument similar to that espoused by the plaintiffs here, the court nonetheless barred one of the employees from bringing an ERISA action because he had never asked for the benefit. *Id.* at 917. This Court agrees with that reasoning and finds that the correspondence received by the plaintiffs in this case does not excuse their failure to exhaust internal administrative remedies before bringing an ERISA action. The plaintiffs' ERISA claim in Count One of the complaint is dismissed without prejudice.

## Conclusion

As stated, the Court grants the defendants' motion to dismiss the federal RICO claim in Count VIII, the breach of contract claim in Count X, the fraudulent misrepresentation claim in Count XI and the intentional infliction of emotional distress claim in Count XII, all with prejudice. The Court grants the motion to dismiss the ERISA claim contained in Count I of the amended complaint without prejudice. The Court grants the motion to dismiss the Section 11 claim in Count III, the Section 10(b) and Rule 10b–5 claims in Count IV, the Section 12(2) claim in Count V and the New Jersey Securities law claim in Count VI with prejudice against all plaintiffs except the ten shareholding plaintiffs, against whom these counts are dismissed without prejudice. The Court denies the motion to dismiss the New Jersey RICO claim contained in Count IX of the amended complaint.

The remaining claim of the plaintiffs is an alleged violation of the New Jersey RICO statute, a state law claim over which this Court does not have original jurisdiction. This Court's subject matter jurisdiction under 28 U.S.C. § 1331 was predicated on plaintiffs' ERISA, federal RICO and federal Securities laws claims. This Court has supplemental jurisdiction over plain-

tiff's state law claims under 28 U.S.C. § 1367. However, § 1367 allows a district court to decline to exercise supplemental jurisdiction over a state claim if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The plaintiffs' ERISA, federal RICO and federal Securities Laws claims have been dismissed against all defendants. Because the underlying ERISA claim has been dismissed and the plaintiffs did not exhaust internal administrative remedies, the claim in Count II of the amended complaint for ERISA fiduciary violations is also dismissed. Similarly, because the underlying claim for intentional infliction of emotional distress has been dismissed, the claim in Count XIII for respondeat superior liability for intentional infliction of emotional distress is also dismissed. This Court no longer has original jurisdiction over any claims in this case and declines to exercise supplemental jurisdiction over the remaining state law claim. Therefore, the plaintiffs' complaint is dismissed in its entirety.[7]

## ORDER

This matter comes before the Court on the motion of defendants United Counties Bancorporation et al. to dismiss Counts III through XII of the amended complaint. Both the plaintiffs, William H. Metz, et al., and the Defendant have submitted cross motions for summary judgment on Count I of the amended complaint.

For the reasons state in the above opinion and after review of the submissions of the parties, the Court grants the defendants' motion to dismiss the federal RICO claim in Count VIII, the breach of contract claim in Count X, the fraudulent misrepresentation claim in Count XI and the intentional infliction of emotional distress claim in Count XII, all with prejudice. The Court grants the motion to dismiss the ERISA claim contained in Count I of the amended complaint without prejudice. The Court grants the motion to dismiss

the Section 11 claim in Count III, the Section 10(b) and Rule 10b–5 claims in Count IV, the Section 12(2) claim in Count V and the New Jersey Securities law claim in Count VI with prejudice against all plaintiffs except the ten shareholding plaintiffs, against whom these counts are dismissed without prejudice. The Court denies the motion to dismiss the New Jersey RICO claim contained in Count IX of the amended complaint.

The remaining claim of the plaintiffs is an alleged violation of the New Jersey RICO statute, a state law claim over which this Court does not have original jurisdiction. This Court's subject matter jurisdiction under 28 U.S.C. § 1331 was predicated on plaintiffs' ERISA, federal RICO and federal Securities laws claims. This Court has supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367. However, § 1367 allows a district court to decline to exercise supplemental jurisdiction over a state claim if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The plaintiffs' ERISA, federal RICO and federal Securities Laws claims have been dismissed against all defendants. Because the underlying ERISA claim has been dismissed and the plaintiffs did not exhaust internal administrative remedies, the claim in Count II of the amended complaint for ERISA fiduciary violations is also dismissed. Similarly, because the underlying claim for intentional infliction of emotional distress has been dismissed, the claim in Count XIII for respondeat superior liability for intentional infliction of emotional distress is also dismissed. This Court no longer has original jurisdiction over any claims in this case and declines to exercise supplemental jurisdiction over the remaining state law claim. Therefore, the plaintiffs' complaint is dismissed in its entirety.[8]

---

7. The Court notes that the amended complaint does not contain a Count VII.

8. The Court notes that the amended complaint does not contain a Count VII.