999 A.2d 1199 (2010)
415 N.J. Super. 29
Jeffrey LIPKOWITZ, M.D., Darmakusuma Ie, M.D., and Kekul Shah, M.D., Plaintiffs-Appellants,
v.
HAMILTON SURGERY CENTER, LLC, Surgical Partners of America, and Michael W. Crews, Defendants-Respondents.
No. A-4489-08T1.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 2010.
Decided August 4, 2010.
*1200 Todd Mizeski argued the cause for appellants (Frier & Levitt, attorneys; Mr. Mizeski and Jonathan E. Levitt, Livingston, on the brief).
R. James Kravitz, Lawrenceville, argued the cause for respondents (Fox Rothschild, attorneys; Mr. Kravitz, of counsel and on the brief; Abbey True Harris, Lawrenceville, on the brief).
Before Judges RODRÍGUEZ, REISNER and YANNOTTI.
The opinion of the court was delivered by
A.A. RODRÍGUEZ, P.J.A.D.
Ophthalmologists Jeffrey Lipkowitz, M.D., and Darmakusuma Ie, M.D., appeal from an order granting summary judgment and dismissing their complaint against Hamilton Surgery Center, LLC. (HSC), Surgical Partners of America (SPA), and Michael W. Crews. A third plaintiff, Kekul Shah, M.D., chose not to participate in the appeal. We affirm.
These are the facts relevant to this appeal, viewed in the light most favorable to appellants. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 530, 666 A.2d 146 (1995). In July 2003, Crews asked appellants to invest in HSC, a multi-specialty ambulatory outpatient surgical center. Appellants signed HSC's Private Offering Memorandum and Operating Agreement and purchased four shares each. Shortly after HSC opened its doors in 2006, both appellants purchased an additional five-and-a-half shares, bringing their total investment to $69,750 each.
*1201 The Offering Memorandum addresses the federal laws with which ambulatory surgery centers (ASC) must comply, including the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7(b). This statute makes it a crime to knowingly solicit or receive remuneration in return for a referral. The Offering Memorandum also addresses the "ASC Safe Harbor," 42 C.F.R. § 1001.952(r)(1), which provides an exception to physicians who use ambulatory centers as a significant part of their medical practice. This safe harbor requires physicians to pass the "One-Third/One-Third" test, which requires that "[a]t least one-third of each physician investor's medical practice income from all sources ... must be derived from the physician's performance of procedures" and "[a]t least one-third of [those] procedures ... must be performed at the investment entity." 42 C.F.R. § 1001.952(r)(3)(ii) and (iii).
The Operating Agreement requires physician members to submit an Annual Eligibility Affirmation Statement, affirming that the member was in compliance with the ASC Safe Harbor. If a physician fails to meet the ASC Safe Harbor requirements, "then in each such case the Governing Board may require such Physician Member to sell all of his or her Membership Units." However, "the Governing Board in its sole discretion may establish a lower percent for an individual Physician Member based on a case-by-case analysis to the extent such lower percent is in compliance with federal and state laws and regulations."
In June 2006, approximately one year after HSC opened for business, Crews scheduled a meeting with appellants to discuss the low percentage of retinal surgeries they were performing. In the previous year, appellants had only scheduled thirty-one surgeries at HSC, of which only twenty were actually performed. A review of those twenty surgeries revealed that the Medicare reimbursement was less than the actual direct costs. Thus, according to Crews, HSC lost money on the surgeries. Crews reminded appellants that they were failing to meet the One-Third/One-Third test, that the Governing Board could elect to purchase their shares, and that appellants had the right to sell their shares to other physicians.
Two months later, the Governing Board unanimously voted to discontinue all retinal surgeries because such surgeries were "not profitable" and "[a]ll Medicare procedures are completed at a financial loss." Crews notified appellants of the Board's decision, noting that "because of the [financial] factors outlined above, there are very few surgery centers that perform retina cases at their centers."
Appellants did not return their Annual Eligibility Affirmation Statement, which was three months overdue. Two months after that, appellants wrote to Crews stating:
We have received the Annual Eligibility Statement ("Statement") concerning our ownership of HSC. From discussions with other investors in HSC, and from questions raised at prior member meetings, it is apparent that we are not the only investors who are unable to truthfully submit the Statement due to their inability to meet the "Substantial Portion" requirements contained therein. Prior to our investment in HSC, we had disclosed to you that we would not likely be able to meet all of the requirements in the Statement, and were assured that this would not impact our ownership. We relied upon your assurance in deciding to invest in HSC.
As a consequence of the above, we feel that it is unreasonable for HSC to require us to sign the Statement. If you intend to hold us to this requirement, we hereby request copies of all Statements *1202 executed by all of the other members of HSC.
Crews responded that the Governing Board was exercising its right to re-purchase appellants' membership units in HSC because appellants had not returned the Statement. The re-purchase price was calculated according to the formula outlined in the Operating Agreement and appellants were issued checks for $185,031 each. This, in addition to an earlier distribution, represented a $136,656 profit over their $69,750 purchase.
Appellants filed an eight-count complaint against respondents, alleging a violation of the New Jersey Uniform Securities Law (USL), N.J.S.A. 49:3-47 to -76, among other claims.[1] Respondents answered and moved for partial summary judgment. The judge granted the motion in part, dismissing the breach of fiduciary duty and breach of covenant of good faith and fair dealing claims.
Respondents moved for summary judgment and reconsideration of the partial denial of their earlier motion. The judge granted respondents' motion, dismissing the remaining claims. The judge concluded that though "a jury might reasonably conclude there was a misrepresentation to [appellants] by Crews in order to secure their initial investments," appellants "made a financial gain from their initial and subsequent investment" and thus failed "as a matter of law [to demonstrate a] financial loss." The judge reasoned, "[I]n looking at the plain language of the statute, a buyer must suffer a financial detriment because a seller knowingly told them an untruth to deceive them." He then found that appellants had not suffered a financial detriment because they made nearly a 165 percent return on their investment.
On appeal, appellants challenge only the dismissal of their USL claim. Appellants argue that the judge's interpretation is incorrect and that they are entitled to damages that amount to giving them the "benefit of the bargain."[2] We disagree.
The USL imposes civil liability on any person who:
Offers, sells or purchases a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), or
... offers, sells or purchases a security by employing any device, scheme, or artifice to defraud.
[N.J.S.A. 49:3-71(a)(2) and (a)(3).]
At issue here is the term "financial detriment" contained in N.J.S.A. 49:3-71(b)(1), which reads:
If any claim is brought for violation of paragraph (2) [or] (3) ... of subsection (a) of this section, the person who bought the security ... shall sustain the burden of proof that the seller ... knew of the untruth or omission and intended to deceive the buyer ... and that the buyer ... has suffered a financial detriment.
[N.J.S.A. 49:3-71(b)(1).]
*1203 This is essentially an issue of first impression, as no decision directly interpreting the term "financial detriment" in the context of the USL exists, aside from Metz v. United Counties Bancorp, 61 F.Supp.2d 364, 379-80 (D.N.J.1999).
Appellants base their "benefit of the bargain" argument upon two unpublished cases, neither of which pertain to financial securities or a claim under the USL. We are not persuaded that these opinions offer guidance in our review of this case. Appellants further argue that "the New Jersey Supreme Court has held that the benefit of the bargain rule is appropriately applied in cases of fraud or concealment, such as the instant lawsuit." However, appellants cite only to cases where the plaintiffs actually pleaded counts of breach of contract, fraud, or misrepresentation in their complaints, not violations of the USL. See Lipsit v. Leonard, 64 N.J. 276, 285, 315 A.2d 25 (1974) (pleading breach of contract and fraud); Finderne Mgmt. Co., Inc. v. Barrett, 402 N.J.Super. 546, 575, 955 A.2d 940 (App.Div.2008) (pleading fraud, consumer fraud, and negligent misrepresentation), certif. denied, 199 N.J. 542, 973 A.2d 945 (2009); (McConkey v. Aon Corp., 354 N.J.Super. 25, 51-52, 804 A.2d 572 (App.Div.2002)) (pleading fraudulent inducement of an employment contract), certif. denied, 175 N.J. 429, 815 A.2d 476 (2003). There are no cases in which a New Jersey court has extended the benefit of the bargain calculation for damages to claims under the USL, the cause of action that appellants chose to plead in their complaint.
When construing a statute, a court seeks to "effectuate the legislative intent in light of the language used and the objects sought to be achieved." McCann v. Clerk of Jersey City, 167 N.J. 311, 320, 771 A.2d 1123 (2001). A statute's language "is the surest indicator of the Legislature's intent." Alan J. Cornblatt, P.A. v. Barow, 153 N.J. 218, 231, 708 A.2d 401 (1998). Thus, when interpreting a statute, "the first step is [to examine] the provisions of the legislative enactment to ascertain whether they are expressed in plain language that, in accordance with ordinary meaning, clearly and unambiguously yields only one interpretation." Richard's Auto City, Inc. v. Dir., Div. of Tax'n, 140 N.J. 523, 531, 659 A.2d 1360 (1995). Moreover, words will be assigned their "ordinary and well-understood meanings" unless the legislature has indicated otherwise. Cornblatt, supra, 153 N.J. at 231, 708 A.2d 401. "If the language is plain and clearly reveals the meaning of the statute, the court's sole function is to enforce the statute in accordance with those terms." State, Dep't of Law & Pub. Safety v. Bigham, 119 N.J. 646, 651, 575 A.2d 868 (1990). Furthermore, a statute that is clear and unambiguous "is not open to construction or interpretation." Krayniak v. Bd. of Trs., 412 N.J.Super. 232, 238, 989 A.2d 306 (App.Div.2010).
The USL requires that appellants prove that they suffered a "financial detriment." N.J.S.A. 49:3-71(b)(1). Looking first at the plain language of the statute, Richard's Auto City, supra, 140 N.J. at 531, 659 A.2d 1360, the term "financial detriment" suggests that appellants must establish that they suffered an actual financial loss or harm. See Black's Law Dictionary 461 (7th ed. 1999) (detriment is "[a]ny loss or harm suffered by a person or property"). Here, appellants experienced an actual financial gain of nearly $137,000 each.
An overall reading of the USL indicates a legislative intent to place investors in the same position they were in before making the investments, not a preference of giving them the benefit of their bargains. For example, a securities seller who violated the OSC is liable to the purchaser only for "the consideration paid for the security *1204 ... together with interest ... and costs, less the amount of any income received on the security." N.J.S.A. 49:3-71(c). Further, a limitations clause provides:
No person may bring an action [for securities fraud] (1) if the buyer received a written offer, before suit and at a time when he owned the security, to refund the consideration paid, together with interest... less the amount of any income received on the security, and he failed to accept the offer within 30 days of its receipt, or (2) if the buyer received such an offer before suit and at a time when he did not own the security, unless he rejected the offer in writing within 30 days of its receipt[.]
[N.J.S.A. 49:3-71(g).]
Thus, both N.J.S.A. 49:3-71(c) and (g) indicate the Legislature's intent to place investors back in the original status quo position, not to use a benefit of the bargain calculation for damages.
Respondents cite to several decisions in various jurisdictions throughout the country, interpreting other states' versions of the U.S.C. None are binding on this court. Only one case, Metz v. United Counties Bancorp, supra, 61 F.Supp.2d at 379-80, interprets the New Jersey USL. It is also not binding on this court.
In Metz, a large group of plaintiff employees claimed "that they [had] suffered a financial detriment because they [did] not receive the more generous severance benefits to which they believe[d] they [were] entitled." The U.S. District Court for the District of New Jersey found that this was "not the kind of injury envisioned by the New Jersey securities fraud statute." Id. at 380. Specifically, the court found that "[s]ecurities laws, both on the federal and state level, require injuries that are substantially related to the purchase, or fluctuations in value, of the security. These laws do not give private rights of action for every peripheral or [attenuated] injury claimed to flow from an alleged instance of securities fraud." Ibid. Similarly, appellants' argument that they are entitled to the subsequent disbursements and profits on their shares is attenuated and not related to the alleged fraud or misrepresentation that induced them to purchase their shares. Further, per Metz, supra, 61 F.Supp.2d at 379, which found that damages are "the amount paid for the securities less any income received," the USL leaves appellants with no damages, as the income received from the securities was greater than the initial investment.
The plain language of N.J.S.A. 49:3-71(b) suggests that appellants must prove that they suffered an actual financial loss. Further, a reading of the damages and limitation provisions indicates a legislative intent to place investors in the original status quo position, not to use the benefit of the bargain formula utilized in traditional fraud cases.
Affirmed.
NOTES
[1] The other claims were: violation of the Limited Liability Act, N.J.S.A. 42:2B-1 to -70; demand for accounting and turnover of records; demand for declaratory judgment voiding a restrictive covenant; violation of Anti-Kickback Law, 42 U.S.C. § 1320a(7); minority shareholder claim, N.J.S.A. 14A:12-7; breach of fiduciary duty; and breach of covenant of good faith and fair dealing.
[2] According to appellants, the stock actually had a fair value of $1,323,000 and they were denied $423,000 in distributions that occurred after their membership interests were repurchased.